IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOE E. WILLIAMS,<br><br>                    Petitioner,<br><br>vs.<br><br>GISELLE MATTESON, Acting Warden,<br>California State Prison, Solano,[1]<br><br>                    Respondent. | No. 2:18-cv-01499-JKS<br><br>MEMORANDUM DECISION |

Joe E. Williams, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Williams is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Solano.  Respondent has answered, and Williams has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On September 29, 2010, Williams and his co-defendant, Isaiah Dominic Hale, were charged with attempted deliberate and premeditated murder, along with various other crimes and enhancements.  Both Williams and Hale pled not guilty and denied the enhancement allegations. Prior to trial, Williams moved to sever his trial from Hale's trial.  The trial court denied the severance motion.  Williams and Hale subsequently proceeded to a joint jury trial.  On direct appeal of his conviction, the California Court of Appeals recounted the following facts underlying the charges against Williams and the evidence presented at trial:

---

[1]        Giselle Matteson is substituted for Robert Neuschmid as Acting Warden, California State Prison, Solano.  FED. R. CIV. P. 25(d).

**The Charges**

Count one charged only Williams with firing at an inhabited dwelling (§ 246) on March 7, 2010.

Count two charged both defendants with the March 10, 2010, attempted murder (§§ 664, 187, subd. (a)) of Julian Williams, who was defendant Joe Williams's cousin. It was further alleged that the attempted murder was committed willfully, deliberately, and with premeditation. In connection with count two, it was further alleged that Hale personally fired a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d)) and defendant Williams was armed with a firearm within the meaning of section 12022, subdivision (a)(1). As for Hale, the information alleged he had a prior serious felony conviction in 2009 for battery with serious bodily injury (§§ 243, subd. (d), 667, subds. (b)–(i ), 1170.12).

**The Prosecution Case**

At trial, the victim testified that his cousin defendant Williams, also known as "Moke," phoned him in mid–February 2010, and asked him to come get an SKS rifle that defendant Williams wanted to get out of his home. Williams and his girlfriend were fighting, and he did not want the gun in the house in case the police were summoned for a domestic disturbance. The victim had the SKS in his vehicle on February 28, 2010, when he was stopped by police who said he and his vehicle fit the description of someone reported to have threatened to shoot someone with an SKS.[FN2] The police searched the vehicle, found the SKS, confiscated it, and arrested the victim for gun possession. The victim initially lied to police, saying he bought the SKS from someone on the street, but later told them he got it from his cousin, Moke. The victim bailed himself out of jail.

> FN2.   There was no evidence that the victim had threatened anyone with the gun, and he was not arrested or charged for such an offense.

The victim testified it was his "understanding" that someone told Williams that the victim said he tried to sell the SKS.

Williams phoned the victim, demanded that the victim pay some amount ($300 or $350) for the SKS, or he would shoot the victim in his face. A voice mail message left on the victim's cell phone, by a voice identified as Williams's voice, told the victim to give him the money or "it's a wrap."

On March 7, 2010, around 10:00 p.m., the victim was home with his pregnant fiancée, Zinha Sylvester, when someone fired a gun at the house two or three times. The victim called defendant Williams, who denied having done it. A neighbor called the police.

On March 10, 2010, after 5:00 p.m., the victim and Sylvester were at a shopping center containing various small business establishments. As they emerged from a nail salon, they encountered Williams on the sidewalk. Williams got "in [the victim's] face" and demanded his money. The victim said he would give Williams the money but could not at that time because he just paid $6,000 to get out of jail. The two yelled at each other. Williams said something about a physical fight and may have made a move

2

pretending he was going to throw a punch.  But instead, Williams turned and walked away, waving his hands in the air.

The victim told the police that, as Williams was walking away, Williams said, "[C]ome to the street, nigga, I'm gonna shoot your ass."  At trial, the victim testified he did not remember saying that to the police.  The victim initially testified that his argument with Williams stopped when Williams walked away.  On cross-examination by Hale's counsel, the victim testified that he did not remember telling the police Williams said something like, "'come to the street, nigga, I'm going to shoot your ass'" as he walked away, but "I remember now that little light bulb, like I said, in my head, he did say something.  Something close to what you said walking to the parking lot."  But then, on cross-examination by Williams's counsel, the victim testified he did not remember whether or not Williams said those words.[FN3]

> FN3.   On further questioning by Hale's counsel, the victim said he was still
>        afraid Williams would kill him for testifying.

The victim was heading toward his vehicle when he became aware of Hale's presence.  The victim testified Hale, who was standing in the parking lot, said something like "is that the nigga that got my gun took?" and then Hale said something to the victim like, "'Nigga, you got my gun took.  You think we playing.'"  The victim had no time to answer before defendant Hale turned away, turned back, and fired a gun at the victim several times, shooting the victim from a distance of about five or six feet.  The victim had no time to duck or react.  He was certain it was Hale who shot him.  Williams was not near Hale when Hale fired the gun.  The victim remembered meeting Hale only once before the shooting.  He had no history with Hale.

The victim denied acting as if he had a gun in his waistband before Hale fired the gun.  He had not made any aggressive move.  He was afraid and did not know what his cousin might do.[FN4]  At one point during cross-examination, the victim said he himself "maybe walked towards them; probably, yes."

> FN4.   Defendant Williams was one to three inches taller and was heavier than
>        the victim.

Sylvester testified consistent with the victim's testimony.  Additionally, she testified that it seemed like Williams was waiting for them when she came out of the nail salon.  When Williams confronted the victim about the firearm and the money, Williams seemed "very irritated."  She told the police that prior to the shooting, Williams said, "'That's a nigga who got my gun took.'"

The shooting was captured by the shopping center's surveillance cameras, and the prosecutor played a video for the jury, People's Exhibit 35.  Hale's defense played its own selection of video surveillance, Exhibit H–4, obtained from the police who obtained the video from the shopping center manager.  We have reviewed the videos.  On both videos, the view of the shooting is partially obstructed by a blue pickup truck depicted in the center of the video frame, facing the storefront.

The video shows the following.  At 18:05:31 on the time stamp, Williams and Hale walk from the right side of the frame toward the store on the opposite side of the truck.  Williams was walking in front of Hale.[FN5]  At 18:05:44, Williams walked into a store.  Hale walked up behind Williams to the door, but did not enter.  At 18:05:49, just as Hale got to the door of the store, Williams walked out of the store, crossed in front of Hale and then started to walk down the covered sidewalk in front of the stores toward the lower left corner of the frame, pausing to look back at Hale momentarily at 18:05:55.  Hale stood in front of the store momentarily looking around.  Then he approached a girl.  At 18:06:17, Hale began to walk down the storefront sidewalk in the direction Williams had walked and disappeared momentarily from the frame in the lower left corner.

> FN5.   The people are identified based on the testimony of the victim and Hale, during which they were both shown the video.

At 18:06:48–51, Hale emerged back into the frame from the lower left corner.  Williams came back into the picture from the same direction at 18:06:58.  Williams, followed by Hale, walked toward the blue pickup.  At 18:07:03, Williams walked to the driver's side rear of the pickup, while Hale walked to the front of the driver's side.  Around this time the victim, wearing light colored clothes, walked on the far left side of the frame moving along the storefront sidewalk with Sylvester and a third person.  At 18:07:03, Hale, who was near the front driver's side tire of the pickup, turned to face the victim and took several steps backward toward the rear of the truck.  At 18:07:06, as Hale passed the driver's side door, he turned and walked toward the rear of the truck with his back to the victim.  Williams in the meantime walked toward and past the back of the truck, looking in the direction of the victim and gesturing with his left hand in a beckoning motion.  The victim testified that this is the point at which Williams told the victim something like step out into the street so he could shoot the victim.

At 18:07:10–12, the victim walked by the front of the truck to the front passenger side.  In the meantime, Hale walked around the rear passenger side of the truck.  At 18:07:12, Hale appears to be looking in Williams's direction while Williams gestures with his left hand in the direction of the victim.  At 18:07:12, Williams momentarily stopped walking, turned, and faced the direction where Hale was while Hale rushed toward the victim, who was at that time stepping off of the curb toward Hale.  At 18:07:13, the victim turned to his right and fell to the ground.  Sylvester and the other people then ran for cover.  At this point, Hale's white hat can be seen on the passenger side of the pickup, next to the front passenger door.  At 18:07:15, Williams, followed by Hale, began to run to the right out of the video frame.  The pickup obstructed the view of the lower part of the victim's arms and his hands as well as the shooting itself.

The victim sustained gunshot wounds to his arm, leg, and penis.  He was in the hospital for approximately two weeks.  He had to undergo several surgeries to replace his shattered elbow with titanium plates and screws.

The victim said he had not wanted to testify, because he did not want to be labeled a snitch.  He denied that he was attempting to minimize his cousin's involvement in the shooting by his testimony.  He said he initially reported that his cousin Williams

had shot him, either alone or with Hale because the victim thought he was going to die and wanted both Williams and Hale to go to jail.

Days after the shooting, police impounded and searched a vehicle Hale had been driving.  The search revealed written rap music lyrics in the glove box.  A police detective testified as an expert on the meaning of rap lyrics.  She opined Hale, whose nickname was "Cash," wrote the lyrics which contained a phrase, "'you can call me cash.'"  She further opined the lyrics described the shooting of the victim.

In the car, the police found gunshot residue on the driver's headrest, the steering wheel and the right front passenger area.  Additionally, there were fingerprints of various persons in the car, including Hale but not Williams.  The car apparently belonged to a woman who had some relationship with Hale.

### The Defense Case

Williams did not testify or call any witnesses.

Hale called as witnesses two medical social workers who testified that the victim, while in the hospital, said he was shot by his cousin.

A police officer testified about confiscating the gun on February 28, 2010.

Another officer testified he responded to a report of the shooting at the shopping center and spoke with Sylvester at the scene.  She said the victim and his cousin Williams were arguing, Williams was asking about his money, a black male with dreads walked up, and then she heard several gunshots but was not sure who actually shot the victim.  Williams had previously threatened the victim and she believed he had recently fired a gun at their home.

Another police officer testified he went to the hospital and spoke separately with the victim and Sylvester.  The victim said he did not know the name of the person who shot him.  Sylvester said Joe Williams had been threatening to shoot the victim over the confiscated gun.

Hale called a person who was an electrician and a rapper/engineer/promoter, who had a rap music group.  He testified rap music is based on a lot of things that are not true.  On cross-examination by the prosecutor, he acknowledged rappers sometimes rap about their own life experiences.  He did not know if the rap lyrics in evidence were about true events, and he did not know Hale.

Hale testified.  He admitted that in 2009, he was convicted of a felony violation of section 243, subdivision (d), battery with serious bodily injury in a case of domestic violence against the mother of his child.

Hale said he and a friend wrote the rap lyrics a month before the shooting and the lyrics had nothing to do with the shooting.  Hale said he bought a gun because his studio got robbed and thereafter, he always carried the gun.  Hale said he did not remember ever meeting the victim before the shooting.

Hale said that on the day of the shooting, he and his friend Williams and a third person went to the shopping center to buy liquor and cigarettes before going to visit Hale's aunt.

Hale admitted he initially told the police a different story.  He told the police that defendant Williams came to "the apartment" where Hale was located; that Williams said

5

he had just "got into it" with his cousin at the liquor store and needed a "thang," (i.e., a gun); that Hale and Williams and a third person went to the shopping center with a gun; and that the third person shot the victim.  At trial, Hale claimed none of this happened.

Hale testified that Williams went into the liquor store while Hale tried to talk to a girl outside.  Hale's younger cousin, who rode over with them, stood by Hale's car while Hale and Williams went toward the store.[FN6]  Williams went inside while Hale stayed outside, trying to talk to the girl.  Hale saw Williams come out of the liquor store, empty-handed, and walked to the right.  Then he noticed that Williams was arguing with someone, but it did not seem heated in the beginning, so Hale kept trying to talk to the girl.  Williams was "flinchin'" (i.e., making an aggressive move) at the victim.  Hale then walked toward Williams to see what was happening because he was not going to let anything happen to Williams.  He said if the person Williams was arguing with took a swing at Williams "we were gonna jump him."  As Hale got closer, he heard Williams asking for his money, and the victim stood behind his girlfriend and laughed, saying he gave it to the bondsman.  When the girlfriend stepped away, it got heated and Williams said he was going to beat the victim's "ass."  The victim said that Williams would have to strike the first blow.

> FN6.   When asked on cross-examination about his cousin's name, Hale said his name is "Frisco."  He said he did not know Frisco's real name and Frisco is his "play cousin," not his real cousin.

Hale testified that Williams walked away, saying, "F this nigger."  As Williams walked away, he waived his hands and told the victim to come out into the street.  According to Hale, up until that point, the confrontation had been between the victim and Williams.  When Williams said, "[F]uck this nigger," the victim looked at Hale and said, "[T]his bitch ass nigger."  Hale testified, he turned to look at the victim.  "I look at him like what I got to do with anything . . . ?"  Hale told the victim, "You a bitch ass nigger."

Hale testified that as Williams continued to walk off, the victim and Williams were yelling at each other.  Hale said he was not paying attention to what the victim was saying to Williams until he heard the victim say, "I'm not worried about it I stay strapped," which Hale explained means the victim had a gun.  Hale said the victim made this comment as Williams was calling the victim out into the street.  According to Hale, at the time the victim made that comment, he was coming around the front of the truck and was walking towards Williams.  Hale said that he was "like in the front of the blue truck" walking across "the island" and Williams was at the back of the truck when the victim made the comment about being strapped.  The victim was still talking, so Hale walked around the back of the truck and was walking back towards the victim to better hear what the victim was saying.  The victim stepped off of the curb and reached under his shirt.  Hale testified that at that point he pulled out his gun and shot the victim because he thought the victim was going to shoot him or Williams.  Hale testified he was scared and he shot out of fear.  He pulled out his gun, closed his eyes, and fired the gun at the victim's legs.  Hale testified he aimed low because he did not want to kill the victim but only to injure him so that he and his friend could get away without getting hurt.  Hale

testified he realized the victim did not have a gun when the victim hit the ground and pulled "his hands out of his pants."

On cross-examination, the prosecutor asked Hale to describe what was happening at several points on the surveillance video. Hale said the point at which the victim called him a "bitch ass nigga" was at 18:07:03 when Hale was near the front of the blue pickup and turned to face the victim. Hale said he immediately returned the insult. Hale testified that the point at which the victim indicated he was "strapped" was at 18:07:08 when Hale was near the back of the cab of the pickup. The victim was at the front of the pickup at that time and Williams was calling the victim out.

Hale denied approaching the victim to shoot him after Hale came around the rear end of the truck. Hale testified, "I was tryin' to finish hearin' what he was sayin'" as the victim was walking towards him and Williams. Unlike on direct examination when he said he realized the victim did not have a gun when he fell and took his hands out of his pants, on cross-examination Hale said he opened his eyes after he stopped shooting and realized the victim did not have a gun when he saw the victim take his hand out of his "shirt."

Hale said he initially told police he was not the shooter because he "didn't want to go to jail for life." During the interview, he began to feel guilty about hurting the victim and told police the truth that he had shot the victim.

*People v. Williams*, No. C069659, 2017 WL 127575, at *1-6 (Cal. Ct. App. Jan. 13, 2017).

At the conclusion of trial, the jury found Williams guilty of attempted murder and found true the allegations that Williams 1) committed the attempted murder willfully, deliberately, and with premeditation, and 2) was armed with a firearm. The trial court granted the prosecution's motion to dismiss Count 1 (shooting at an inhabited dwelling) after the jury was unable to reach a verdict. The trial court sentenced Williams to seven years to life imprisonment for attempted murder, plus one consecutive year for the firearm enhancement.[2]

---

[2]      The jury found Hale guilty of attempted murder and found true allegations that Hale 1) committed the attempted murder willfully, deliberately, and with premeditation, 2) personally used a firearm, 3) personally and intentionally discharged the firearm, 4) caused great bodily injury by his personal and intentional discharge of the gun, and 5) sustained a prior strike conviction in 2009 for battery with serious bodily injury. The court sentenced Hale to an aggregate term of 39 years to life imprisonment.

Through counsel, Williams appealed his conviction, arguing that: 1) the trial court erred in denying his severance motion; 2) the evidence presented was legally insufficient to find that he aided and abetted an attempted murder, or did so in a willful, deliberate, and premeditated manner; and 3) the trial court failed to instruct the jury about the need for corroboration of accomplice testimony.  Williams also submitted a supplemental brief noting that the abstract of judgment overstated the amount of restitution imposed by the trial court.  The Court of Appeal modified Williams' judgment to reflect the correct restitution amount, but otherwise affirmed the judgment against Williams in a reasoned, unpublished opinion issued on January 13, 2017. *Williams*, 2017 WL 127575, at *25.[3]  Williams petitioned in the California Supreme Court for review of all claims unsuccessfully raised before the Court of Appeal, and the Supreme Court denied review without comment on April 12, 2017.  His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on July 11, 2017.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Williams timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on May 16, 2018.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Williams argues, as he did on direct appeal, that: 1) the trial court erred in denying his severance motion; 2) the evidence presented was legally insufficient to find that he aided and abetted an attempted murder, or that did so in a willful,

---

[3]     The Court of Appeal also unanimously affirmed the judgment against Hale.  *Id.*

deliberate, and premeditated manner; and 3) the trial court failed to instruct the jury about the need for corroboration of accomplice testimony.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

9

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Ground 1.    <u>*Erroneous Denial of Severance Motion*</u>

Williams first argues that the trial court erred in denying his motion to sever his trial from Hale's trial.  In considering this claim on direct appeal, the California Court of Appeal laid out the following factual background:

> Williams filed an in limine motion to sever his trial from Hale's trial, arguing: (1) their defenses were inconsistent; (2) the case against him was weak while the case against Hale, who admitted shooting the victim, was strong; and (3) his confrontation right would be violated if Hale's out-of-court statements were admitted without Hale testifying at trial.  Williams also argued that Hale's prior propensity to disrupt court proceedings might cause the jurors to disfavor Williams.[FN19]

> FN19.  On the date of the preliminary hearing, Hale had lunged at Williams. After the disruption, both Hale and Williams waived their right to a preliminary hearing.

The information Williams presented to the court at the time of his severance motion was that the victim and his girlfriend came out of a store and were confronted by Williams, who challenged the victim to a physical fight because the victim had lied to police that a gun found in the victim's possession during a recent arrest belonged to Williams.  When the victim would not fight, Williams turned away.  Hale came forward and fired a gun at the victim.  Williams heard the gunshots but did not know where they were aimed and ran away.  The police collected four .380–caliber casings at the scene, the same caliber that had been used in an earlier drive-by shooting of the victim's home.[FN20]

> FN20.  Williams's severance motion claimed the government would "scientifically show" the same gun was used in the shooting of the victim's house and the shooting at the shopping center.  However, the testimony ultimately adduced at trial was that the forensic examiner could not "conclusively" say the shell casings were fired from the same gun (because no gun had been provided to her), although it was "likely" the same gun fired the shell casings.

Hale eventually admitted to the police that he was the shooter at the shopping center.  Hale told police that Williams did not know Hale was carrying a gun and was surprised by the gunshots.  Hale denied doing the drive-by shooting and said he "'heard'" Williams had done a drive-by shooting.  Williams denied having used the car driven by Hale and denied all allegations.  Hale told police he knew nothing about the assault weapon that police took from the victim.

The victim told police that Williams challenged him to fight, saying the victim owed $350 because that was the amount defendant Williams had paid for the SKS.  The victim said he was not going to fight because he was out on bail and had used his money for bail.  Williams made fighting motions trying to get the victim to fight.  Williams then walked away, saying, "[Y]ou come to the street nigga and I'm gonna shoot your ass."  A "light skinned dread head guy," whom the victim knew as "'Cash,'" walked up, asking, "'[T]hat the nigga got my gun took,'" and defendant Williams said, "[Y]eah."  Cash then fired a gun at the victim.

The severance motion asserted there was no indication that Hale would testify, and therefore his admissions to police would be admitted into evidence without defendant Williams having the opportunity to confront and cross-examine him.

Regarding cross-admissibility of evidence, Williams asserted in the severance motion that the prosecution was in possession of a video showing that Hale shot the victim, and the prosecution had evidence that Hale admitted he shot the victim and said that Williams neither shot the victim nor knew that Hale had a gun, and the prosecution

had evidence that the gun used to shoot the victim was the same weapon that was used in an earlier drive-by shooting of the victim's home.  There were no witnesses to the drive-by shooting, only rumors.  The only connection was that a vehicle matching the description of Hale's girlfriend's car was seen leaving the scene of the drive-by shooting.  At the hearing of the motion, counsel told the court that Williams's fingerprints were not found in the car.  "Therefore, the [prosecution] having [] Hale, the person from whom the gun was recovered, associated with [] Williams in the home shooting is a stretch that is only accomplished because the case against [] Williams[] is so weak.  This deprives [] Williams of due process and a fair trial."

Before the ruling on the severance motion, Hale's attorney disclosed that Hale's defense would be that he shot the victim in self-defense.

The trial court, which had already ordered a security restraint on Hale's nonwriting hand during trial, disagreed that an outburst by Hale would taint Williams.  The court ruled the cases "are properly joined.  They are of the same class.  They are what the Legislature envisioned as being joinable offenses.  I don't see where a weak case is joined with a stronger case.  I don't see that being the issue.  And so I really see no basis to grant his severance."  In response to an argument that Williams's defense was inconsistent with Hale's defense, the trial court observed, "The Supreme Court has said if that was the basis, then there would be no—very few codefendant[] cases ever going forward.  Generally speaking, in codefendant cases a finger gets pointed somewhere, and it's usually not at the person themselves.  So that cannot be the touchstone for basis to sever.  And so I am going to deny your severance motion."

*Williams*, 2017 WL 127575, at *16-17.

The United States Supreme Court has never held that a criminal defendant has a federal constitutional right to bifurcation.  *Spencer v. Texas*, 385 U.S. 554, 568 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*).  Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (a court must consider whether "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th

Cir. 1991) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal brackets and citation omitted).

Williams bears the burden of proving that he is entitled to federal habeas relief, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003), and he must establish that the prejudice arising from the failure to grant a severance was so "clear, manifest or undue" that he was denied a fair trial, *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).

Although it does not appear that the Ninth Circuit has directly addressed whether due process may be violated where a trial court refuses to sever trials involving antagonistic defenses, the Second Circuit has answered the question in the affirmative where one of the co-defendants alleges that another co-defendant framed him. *See United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990), *overruled by Zafiro*, 506 U.S. at 538. In that case, "Both defendants gave detailed and mutually exclusive explanations of their conduct on the day of the arrest. The damage done was greatly enhanced by the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted the story to escape blame." *Id.*

The Second Circuit later concluded that the Supreme Court overruled *Serpoosh* in *Zafiro*, 506 U.S. at 538. *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994). In any event, the defenses involved in this case are not as incompatible as the defenses employed in *Serpoosh*. As the Court of Appeal explained:

> As for Hale's defense, his self-defense theory did not require severance, because the jury's acceptance of that theory would not preclude acquittal of Williams. To the

contrary, it would help Williams, because if the shooter was justified, Williams would not be convicted as an aider and abettor. Williams could not have benefitted from Hale's self-defense claim without Hale's testimony. Hale's claim of self-defense, which of course meant the shooting was not planned, was not inconsistent with Williams's defense that he was walking away from the confrontation and did not know Hale would fire the gun.

*Williams*, 2017 WL 127575, at *18 (citations and footnote omitted).

Moreover, as the California Court of Appeal correctly observed, the record show sthat Hale testified at trial and was subject to cross-examination, thus eliminating any confrontation concern. Likewise, evidence apart from any introduced by Hale also suggested Williams' guilt. As the Court of Appeal recognized, both the victim and Sylvester stated that Williams was walking toward the street urging the victim to fight, thus undermining Williams' claim that, without Hale, the only evidence introduced was that Williams was walking away when Hale shot the victim.

Furthermore, the Court of Appeal reasonably rejected Williams' contentions that his association with Hale at their joint trial prejudiced him in violation of due process, particularly given that, as the appellate court noted, "in a separate trial the jury would have learned about Williams's association with Hale." *Id.* at 18. The Court of Appeal reasonably concluded that there was no due process violation by trying Hale jointly with Williams:

> Williams argues the case against him was weak and the case against Hale was stronger because police found gunshot residue and Hale's fingerprint in the vehicle which police saw Hale driving several days after the victim was shot and which matched the description of a car seen leaving the scene of the drive-by shooting of the victim's home. However, though the car apparently belonged to a woman who had a relationship with Hale, the victim had seen defendant Williams driving it on one occasion. The victim also testified he had been receiving threatening phone calls from Williams. In any event, it seems clear Williams was not prejudiced by the joint trial, because the jury did not return a verdict against him on the drive-by shooting, despite the evidence implicating his friend Hale in that shooting.

14

Williams argues the joint trial prejudiced him because the jury learned of Hale's prior felony conviction. To justify severance on such grounds, the characteristics of one defendant must be such that the jury will find the remaining defendant guilty simply because of his association with a reprehensible person, rather than assessing each defendant's individual guilt of the charged crimes. We do not see how Hale having been convicted of battery on his girlfriend prejudiced Williams. It does not appear the jury would have found Hale's characteristics "so overwhelming compared" to Williams that it convicted Williams simply because of his association with Hale, a person who had been previously convicted of domestic violence. Moreover, the trial court instructed the jurors they could consider the prior conviction only in determining the truth of the prior conviction allegation and evaluating Hale's credibility, and the court instructed the jury not to consider the exhibit of Hale's prior conviction against Williams. We presume the jury followed the trial court's instructions.

*Williams*, 2017 WL 127575, at *19 (citations omitted).

Under the circumstances of this case, Williams has not established that the state trial court's refusal to bifurcate the trial rendered his trial fundamentally unfair. *Davis*, 384 F.3d at 638. Consequently, Williams is not entitled to relief on this claim.

Ground 2.     <u>*Sufficiency of the Evidence*</u>

Williams next contends that the prosecution failed to present legally sufficient evidence to show that: 1) he aided and abetted Hale in attempted murder; and 2) he acted with the requisite deliberation and premeditation to support the attempted murder charge. As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it

15

would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Under California law, murder is the unlawful killing of a human being with malice aforethought. CAL. PENAL CODE § 187(a). To prove attempted murder, it must be established that an individual took at least one direct but ineffective step toward killing a person and he intended to kill that person. CAL. PENAL CODE §§ 21 a, 664, 187(a). Although motive is not an element of the crime of attempted murder, evidence of motive is often probative of intent to kill.

*People v. Smith*, 124 P.3d 730, 741 (Cal. 2005).  Additionally, aside from motive, intent to kill may be inferred from a perpetrator's acts and the circumstances of the crime.  *Id.*  In particular, the act of purposefully firing a gun at another at close range gives rise to an inference of intent to kill, regardless if there is any showing of a particular motive to kill the victim.  *Id.* at 742.

In this case, the prosecution proceeded on the theory that Hale was the actual shooter and that Williams aided and abetted Hale.  Under California law, a person who either directly commits or aids and abets an offense is guilty as a principal.  *See* CAL. PENAL CODE § 31.  A defendant may be found guilty under an aiding and abetting theory if he: 1) acted with knowledge of the unlawful purpose of the perpetrator; 2) acted with the intent or purpose of committing, encouraging, or facilitating the commission of the offense; and 3) by act or advice, aided, promoted, encouraged or instigated the commission of the crime.  *See People v. Prettyman*, 926 P.2d 1013, 1018-19 (1996).  An aider and abettor's presence at the scene of the crime, companionship with the perpetrator, and conduct before and after the offense are among the factors that may be considered in determining whether the aider and abettor had the requisite knowledge and intent.  *People v. Campbell*, 30 Cal. Rptr. 2d 525, 529 (Cal. Ct. App. 1994).

On direct appeal, Williams likewise argued that there was insufficient evidence to support a jury's finding that he aided and abetted Hale because there was no evidence, other than "Hale's uncorroborated statement," of Williams's involvement, and he was walking away from the victim when Hale approached and shot the victim.  In rejecting Williams's claim, the California Court of Appeal's application of the *Jackson* standard was not objectively unreasonable.  When viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have inferred Williams's direct involvement, namely the testimony of

17

Sylvester and the victim as well as the surveillance video evidence.  A rational trier of fact

viewing this evidence in the light most favorable to the prosecution could infer that Hale had an

intent to kill and that Williams had the requisite knowledge and intent to be liable as an aider and

abetter.

Moreover, the Court of Appeal likewise reasonably concluded that there was substantial

evidence of deliberation and premeditation by Williams:

> Williams threatened to shoot the victim unless he was compensated for the confiscated SKS.  Williams left a phone message for the victim to pay up or "it's a wrap." Williams and Hale went to the shopping center together with a gun.  The surveillance video showed Williams entering and leaving the liquor store within five seconds, supporting the inference he was looking for someone.  Williams saw the victim coming out of the nail salon, confronted him, demanded money and made fighting moves when he did not get the money.  Williams taunted the victim to come to the street to have his "ass" shot.  Hale said, "'You think *we* playing,'" (italics added) before he shot the victim. Just before Hale rushed the victim, the video shows Williams gesturing with his left arm towards the victim.  Thus, there was evidence Williams planned to kill the victim if the victim did not pay him and had motive for the killing.  The manner of killing was multiple gunshots, conduct likely to result in death.
> Looking at the evidence in a light most favorable for the prosecution, there is substantial evidence that Williams acted willfully, with deliberation and premeditation, in the attempted murder of the victim

*Williams*, 2017 WL 127575, at *24.

To the extent Williams again points to evidence to the contrary, he misperceives the role

of a federal court in a habeas proceeding challenging a state-court conviction.  Under *Jackson*,

the role of this Court is to simply determine whether there is any evidence, if accepted as

credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*, 513 U.S. 298, 330

(1995).  In this case, the appellate court reasonably determined that there was sufficient evidence

that Hale shot the victim, that Hale intended to kill the victim with that shot, and that Williams's

actions likewise evinced an intent so as to satisfy the elements of attempted murder under

California law.  *See United States v. Larios*, 640 F.2d 938, 940 (9th Cir. 1981) ("The testimony

of one witness . . . is sufficient to uphold a conviction." (citations omitted)); *see also Bruce v.*

*Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004) (per curiam) (same).  Although it might have

been possible to draw a different inference from the evidence, this Court is required to resolve

that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Williams bears the

burden of establishing by clear and convincing evidence that these factual findings were

erroneous.  28 U.S.C. § 2254(e)(1).  He has failed to carry such burden.  The record does not

compel the conclusion that no rational trier of fact could have found that Williams was guilty of

attempted murder, especially considering the double deference owed under *Jackson* and

AEDPA.  Williams is therefore not entitled to relief on this legal insufficiency claim.

Ground 3.       *Instructional Error*

        Finally, Williams argues that the trial court erred when it failed to instruct the jury *sua*

*sponte* with CALCRIM No. 334.  Under California law, uncorroborated accomplice testimony

cannot support a criminal conviction.  Cal. Penal Code § 1111.  Section 1111 requires that, in

cases involving accomplice testimony, a jury must be instructed with CALCRIM No. 334, which

would have told the jury in Williams's case that: 1) it had to determine whether Hale was an

accomplice; 2) if Hale was an accomplice, his testimony must be viewed with caution insofar as

it tended to implicate Williams; 3) the jury could not convict Williams based on Hale's

statements or testimony alone; and 4) that it could use Hale's statements or testimony to convict

Williams only if Hale's statements or testimony was corroborated by independent evidence that

tended to connect Williams to the charged crime.  On direct appeal, the Court of Appeal agreed

that the trial court erred by not instructing on accomplice testimony, but nonetheless concluded that the error was harmless.

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995). An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law. *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial

court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if

the trial court's failure to give the instruction violated due process, habeas relief would still not

be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519

U.S. 2, 5 (1996).

  In this case, the Court of Appeal concluded that it was bound by precedent of the

California Supreme Court "that error related to accomplice instructions under section 1111 does

not implicate federal constitutional error because section 1111 does not bear on the substantive

guilt or innocence of the defendant but rather the reliability of the evidence used to conviction

him." *Williams*, 2017 WL 127575, at *20 (citing *People v. Frye*, 959 P.2d 183, 221-22 (Cal.

1998), *overruled on other grounds by People v. Doolin*, 198 P.3d 11 (Cal. 2009)). To the extent

Williams again challenges that line of authority, he fails to show that it is contrary to, or unreasonably applies, precedent of the U.S. Supreme Court.

Rather, the United States Supreme Court has held that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." *Caminetti v. United States*, 242 U.S. 470, 495 (1917); *see United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face.").  "When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions." *United States v. Augenblick*, 393 U.S. 348, 352 (1969).  Therefore, the requirement of California Penal Code § 1111 that "'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right" and cannot be the basis of federal habeas relief.  *Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010).

As the Ninth Circuit has explained, California's statutory law prohibiting convictions based solely on uncorroborated accomplice testimony is only a state law rule: it is not required by Constitution or federal law.  *See Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000).  Thus, because Williams's instructional error claim is grounded in the state law requirement that accomplice testimony be corroborated, he can show no constitutional violation on that basis. *Takacs v. Engle*, 768 F.2d 122, 127 (6th Cir. 1985) ("If uncorroborated accomplice testimony is sufficient to support a conviction under the Constitution, there can be no constitutional right to instruct the jury that it must find corroboration for an accomplice's testimony."); *see also United States v. Fritts*, 505 F.2d 168, 169 (9th Cir. 1974) (holding on direct review that trial court's

failure *sua sponte* give cautionary instruction on accomplice testimony did not warrant reversal).
Accordingly, Williams cannot prevail on this claim.

V. CONCLUSION AND ORDER

Williams is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ
of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to grant a Certificate of
Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain
a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree
with the district court's resolution of his constitutional claims or that jurists could conclude the
issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,
537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the
Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 19, 2020.

                                                              ___/s/James K. Singleton, Jr._____
                                                               JAMES K. SINGLETON, JR.
                                                            Senior United States District Judge